[No. 19422.  Department Two.  January 21, 1926.]

JOHN A. MOHR *et al.*, *Appellants*, v. ADOLPH JOHNSON
*et al.*, *Respondents.*[1]

[1] REFORMATION OF INSTRUMENTS (6)—GROUNDS—MUTUALITY OF
MISTAKE. The grantor is entitled to the reformation of a deed
of two lots, to exclude a strip 6½ feet wide which he had pre-
viously conveyed to another, on the ground of mutual mistake,
where there was a well marked boundary on the line of the 6½
foot strip, the grantees had been occupying the premises so in-
closed, and thought they were buying the property inclosed, and
did not know that the deed covered the 6½ foot strip which was
more land than they intended to buy (MAIN, J., dissenting).

Appeal from a judgment of the superior court for
Spokane county, Lindsley, J., entered May 20, 1925,
upon findings in favor of defendants, in an action to
reform a deed. Reversed.

*David Herman* and *Williams & Cornelius,* for ap-
pellants.

*Lund & Dodds,* for respondents.

MACKINTOSH, J.—Lot 18, Block 113, Railroad Ad-
dition to Spokane, as platted, is 37 feet, 3 inches wide,
and Lot 17, which joins it on the west, has a platted
width of 25 feet. Both lots are 140 feet deep. In
January, 1903, the appellants purchased Lots 17 and
18, and at that time there was a fence extending the
depth of Lot 17 and situated 6½ feet east of the west
line of that lot as platted. Within a week after the
appellants purchased the two lots, they deeded to the
owner of Lot 16, which lot joins 17 on the west, this
6½ foot strip, and thereby the dividing line between
the appellants' property and their neighbor's on the
west became the line fence. Houses were subsequently
erected upon the appellants' property and upon the

[1]Reported in 242 Pac. 385.

property of their westerly neighbor, and the appellants lived in their house on their property until 1910. Some time in 1909 the respondents became tenants of the house upon Lot 16, and, when the appellants vacated their house on Lots 17 and 18, the respondents became tenants of it, and remained in possession of it for ten years.

In 1920, the appellants sold the property to the respondents and made the conveyance by deed which described the premises as Lots 17 and 18. This action is one to reform that deed by correcting the description so that it will describe the property actually owned at the time by the appellants, that is Lot 18 and the easterly 18½ feet of Lot 17. In order for this reformation to take place, it is necessary, of course, to find that a mutual mistake was made and that the description as contained in the deed was not the description of what was in the minds of both the parties at the time the deed was drawn. There is no question in this case of any fraud, nor is the question of negligence involved. The deed was executed without an abstract having been furnished, and the description in it was obtained from the original deed of 1903 by which the appellants had acquired their title. At the time the deed was executed, it is apparent that the appellants had forgotten the fact that they had conveyed the westerly 6½ feet of Lot 17, and that they made a mistake in the deed; for there is no question that they did not intend to convey Lots 17 and 18 as they were platted, but only intended to convey that portion of Lot 17 that they had not theretofore conveyed.

The question, then, arises whether the respondents, at the time they received the deed, were expecting to obtain the full area described as Lots 17 and 18, or were only expecting to receive Lot 18 and Lot 17, less

the 6½ feet. If they were expecting to receive the full area of 17 and 18, there was no mutual mistake. If they were expecting to receive the lesser area, and the greater was described in the deed, there was a mutual mistake, and the deed should be reformed.

To determine what was in the minds of the respondents, it is necessary to review the testimony, and we will do this in some detail, for the reason that that review has brought us to a conclusion contrary to that arrived at by the trial court.

The civil engineer, called by the appellants, testified that there was a noticeable line of demarcation between the Mohr property and that to the west; that this line was located 6½ feet from the westerly line of Lot 17 as platted; that this demarcation consisted of a terrace in the front portion of the lot, back of that a retaining wall, and back of that a high board fence extending to the alley in the rear of the property.

The appellant husband testified that, at the time he purchased the property, there was a fence extending from the alley to the street, and that this fence was there when the property was rented in 1910 to the respondents, and that a part of the fence was still remaining when, in 1920, he sold to the respondents. That shortly after his purchase of the property, he excavated for a house, and alongside of the fence put in a rock retaining wall on the line of the fence and that that wall is still there. That this fence and wall were on the east edge of the 6½ foot strip. That, while the respondents were living in the property to the west, he never exercised any acts of ownership or crossed this 6½ foot strip. That, the respondents cultivated a garden on that strip. That when the respondents, in repeated conversations with the appellants regarding the purchase of the property, re-

ferred to it, they referred to it not by its description or as lots, but as "our property." Appellant further testified that he never had possession of the land west of the fence, or of the 6½ foot strip; that, immediately after purchasing it, he deeded that strip to his neighbor to the west.

Mrs. Mohr testified that, at the time the respondents took possession of the house on Lot 16, there was a fence separating the two properties; that this fence was on the line of the 6½ foot strip; that the appellants had never exercised any acts of ownership, or done anything, in regard to the 6½ foot strip; that there was evidence on the property of a clearly defined physical boundary; that, while the respondents were living on Lot 16, they visited back and forth with the appellants, and that in doing so they had to climb over or under the fence. She testified that, when the respondents were negotiating with the appellants for the purchase of the property, she told them that the property was that on the east side of the fence. That the property was not referred to by lots, but as the property which was being rented by the respondents from the appellants. She further testified that the respondents first called the appellants' attention to the misdescription in the deed in 1921, when they told the appellants that they had received information from a gardener, whom they had employed and to whom they had given the deed in order to find the boundaries of their property, that according to the deed they were entitled to Lots 17 and 18 in full. She further testified that the fence, from the street back as far as the house, was taken down by the respondents themselves many years before they purchased the property.

A daughter of the appellants testified as to the existence of the line fence, and the recognition by the respondents of the division between the properties, and

the fact that the line of the fence had been treated as a boundary by the respondents and their neighbors.

The laborer who excavated the cellar and built the foundation for the appellant testified as to the difference in the elevation of the two properties and the putting in of a retaining wall. Two neighbors testified as to the physical facts showing a clear line of demarcation between the properties. One of them testified that he had seen the respondents, while they were renting the appellants' property, go around the fence, and that, after they had been in the property for some time, the front end of the fence was taken down, and after that they crossed the lawn; that this fence had been removed after the appellants had left the property and when it was in the possession of the respondents.

The present tenants of the property to the west testified as to the physical condition of the property and the clearly defined boundary line. These witnesses testified that they were occupying the property while the respondents were in occupation of the appellants' property, and that they cultivated their property up to the fence line and that the respondents cultivated the property on the opposite side of the fence; that each maintained their respective lawns and that the respondents never came upon the property of the witnesses.

The respondents' case was presented by witnesses who testified as follows:

The first witness was a gardener employed in November, 1921, by the respondents, who gave him the deed describing their property. From that deed, he discovered that the deed called for more property than was being used by the respondents. He testified, as the other witnesses had, to the depression between the properties, the wall and the line of rocks. He was the one who first disclosed to the respondents the fact

that the deed gave them property beyond the fence line. He testified that they were surprised when he informed them of the fact.

The respondent wife testified that the information given by the gardener was the first knowledge that she had that the line was not in conformity with the deed. She testified that they had lived for a number of years in both places, and had kept roomers and boarders in the two places. She failed to remember any fence in the front part of the property, although she admitted there was a difference in elevation of the two properties and that there was a wall and a fence toward the rear. She testified the property she and her husband were intending to buy from the appellants was the property which they were renting from them, and that they never questioned the appellants as to whether the property extended from the fence; that she and her husband saw the fence and the rocks which were in line with it, that they had always been there; that she never paid any attention to the line nor inquired why the fence and rocks were there, but she knew that the property she was renting was the property she intended to buy. She, of course, testified that she and her husband bought two full lots; that she paid the taxes in 1921, and every year since, but she claims that she did not look at the tax receipts, although they plainly state that Lot 18 and only the east 18½ feet of Lot 17 was being taxed to the respondents. She further testified that, prior to the time that she handed the deed to the gardener, she was satisfied that the line was the fence line. She testified that the appellants never had told her the size of the lots, that she was not bothered about those things.

The owner of Lot 16 and the 6½ foot strip testified that he has always known where the line between the properties was; that the high board fence in the rear

and the rocks constituted a continuous line; that he and his tenants have always kept possession of the land up to the terrace in front, and to the line of rocks on the side and the high board fence in the rear; that no one else has exercised any rights in the 6½ foot strip.

The respondent husband testified as follows:

"Q.   When did you first learn that Mr. Mohr didn't own the property that was covered by his deed to you? A. Well, that was when we were going to fix up the place in front.   We had a gardener, Mr. Krause, to fix it up, and then he told us he thought we had a little wider lot than we thought we had.   Q. How much wider?   A. 6½ feet.   Q. You mean he showed you that you had 6½ feet more than you thought you had? A. We should have more wider lot than we thought we had.   Q. How much wider?   A. 6½ feet.   Q. He showed you he thought you had a wider lot than you had?   A. Yes."

On cross-examination, he testified that he did not remember a fence between the appellants' property and the property to the west when he first occupied the latter property, although he says, in referring to the fence, "It got away from there.   I do not know how it got away, but it was taken away anyway."   And he further testified that the entire fence rotted away and was taken down a piece at a time.   It is apparent from his testimony that the fence was a fence marking the two properties at the time that the respondents first took possession as tenants.   The witness further testified that he never asked the appellants where the line was, and nothing was ever said about the line or the amount of property which was being sold; that what he was interested in was obtaining a deed to the house as a residence.   He testified that the 6½ foot strip was cultivated by the occupants of Lot 16; that he paid no attention to that strip and had never made any use of it; that appellants never told him that the

property which they were conveying to him extended east from the line of rocks; that appellants never mentioned any rocks at all.

The son of the respondents, a young man twenty-five years of age, testified that he had paid the taxes on the property in question, and that he had noticed on the tax receipt that his parents were only paying taxes on the easterly 18½ feet of Lot 17; that he made inquiry about it at the time and found that someone else was paying taxes on the westerly 6½ feet, and that he discovered that in 1903 that strip had been sold; that he made this discovery a year after his parents bought the property, but that he did not say anything about the matter to the appellants for a year or more thereafter.

No action was taken by the respondents looking to an assertion of their claim of title to the 6½ feet, and this action was begun in June, 1924.

[1] The situation, as presented by this testimony, is one where there was a clearly defined physical boundary between two properties, which boundary had been recognized by the owners and tenants on either side of it for years, and where one of those tenants, who had occupied the property for a period of ten years, with full knowledge of the actual boundary, accepted a deed describing more property than he was expecting to receive. The respondents here were not interested in, nor did they have any expectation of receiving title to, Lots 17 and 18 as they were platted. But what they did expect to receive, and what they were interested in, was the property which they were occupying as tenants of the appellants. And that property was marked on the ground. It extended to a line which had existed for years, originally consisting of a fence which they themselves had partly removed, and for years thereafter consisting of a rock wall,

together with a portion of the old fence and a terrace. There can be no question that the parties to the deed had in mind the conveyance of Lot 18 and the easterly 18½ feet of Lot 17, and that it was through mutual mistake that the description was inserted in the deed of Lot 17 in full.

There having been a mutual mistake, the appellants are entitled to have the deed reformed to comply with the intention of the parties at the time it was originally made, and the case will be remanded with instructions to reform the deed and also the mortgage given at the time by the respondents as security for the purchase price.

TOLMAN, C. J., PARKER, and MITCHELL, JJ., concur.

MAIN, J. (dissenting)—In my opinion there was no mutual mistake in this case. At the time of the transaction, the appellants intended to sell, and the respondents intended to purchase, Lots 18 and 17. There were no negotiations based upon the physical features of the property. The appellants had the deed drawn conveying Lots 18 and 17, and at that time undoubtedly intended to convey all of both lots. The fact that they had forgotten that years before they had conveyed six and one-half feet off of one side of Lot 17 does not show a mutual mistake. In order that there be such a mistake, they must at that time have intended to sell Lot 17, less the six and one-half feet, and the appellants must have intended to purchase that lot as diminished. I am unable to agree with the majority opinion and, therefore, dissent.